Yenisey Rodriguez-McCloskey, Esq.
Rodriguez-McCloskey PLLC
300 Cadman Plaza W., Fl. 12
Brooklyn, New York 11201
Office (347) 689-7625
Direct (347) 689-7641

Hearing:  July 19, 2018 at 4:00PM

*Attorneys for Amethyst ALT*
*Asset Fund 2016, LLC*

_____

In re:

LORING ESTATES, LLC,

                    Debtor.

Chapter 7

Case No. 1-12-45757 (NHL)

_____

### DECLARATION IN OPPOSITION TO
### TRUSTEE'S MOTION TO APPROVE SALE

LORENZO DELUCA declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney admitted to practice in the State of New York and a principal of Amethyst ALT Asset Fund 2016, LLC ("Amethyst"), a New York Limited Liability Company and the successor in interest of DLJ Mortgage Capital, Inc. ("DLJ").[1]

2.      Amethyst opposes the Trustee's motion and supports instead an immediate competitive public sale of the seven properties ("the Properties")[2] subject to higher or better offers. There are seventy-six virtually identical townhomes at Loring Estates ("the Estates").  The

_____

[1] On June 27, 2018, Amethyst filed with this Court its Limited Notice of Assignment of Claim, a copy of which is annexed hereto as Exhibit A.  DLJ assigned to Amethyst a judgment entered in a New York action against Halifax Group, LLC ("Halifax"), Loring Estates, LLC ("Loring"), and others, granted in a New York action in favor of DLJ in the amount of $5,000,000 (the "Judgment").  Accordingly, Amethyst is a party in interest herein.

[2] The Properties at issue are 442, 448, and 450 Sapphire Street, 1395 and 1397 Stanley Avenue, and 1432 Loring Avenue.

remaining sixty-nine homeowners have been adversely affected by the anarchy fostered by this continuing litigation. The Estates community should not be held hostage to the name-calling and jockeying for position endemic to expensive litigation strategies. Once the Properties are sold, the litigation can focus on who is entitled to the proceeds of the sale.

3. This Court resolved a similar dispute, In Re The Axxion Group LLC, by requiring a competitive, arms-length sale that resulted in gross proceeds sixty percent higher than anticipated. It should be noted that the Axxion and Loring cases are related because I facilitated the final resolution of the Axxion dispute by exchanging the claims of Delshah Ventures LLC, an entity I own 100, in Axxion for DLJ's claims against Loring (p. 7,¶ 3). A copy of the Settlement Agreement between with DLJ is annexed hereto as Exhibit B.[3]

4. There should be no mystery surrounding the sudden termination of the Axxion hostilities. The Trustee's Motion provides for a sale that wholly precludes competitive or higher and better offers; this type of sale is not in the best interest of the estate. If permitted, Amethyst or an affiliate, Concord Loring, would offer more than the amount offered by the purchaser, Welton R.E. Corp. ("Welton"), a Colorado Corporation, propounded by the Trustee. The Trustee's rationale for this extraordinary omission is that ostensibly, "no other legitimate party would have any interest whatsoever in purchasing the Estate's Realty Interests that are subject to so many Liens and Claims" (Trustee Motion, ¶ 31). That assumption is completely unfounded and demonstrates the Trustee's bias in favor of Stout Street Fund I, LP ("Stout").

---

[3]The DLJ Settlement was consented to by both Darshan Shah ("Shah") and his son Michael. Shah had agreed to participate in the transaction but Michael refused to fund his participation claiming that the likelihood of success was slim. After the Second Department's reversal in March 2017, Shah realized his mistake and he began his efforts to opportunistically use the Sheriff's scrivener's error in the Griffon-Loring deed to his advantage.

5.    Many of the other properties at the Estates are in foreclosure.  At the most recent foreclosure sale, 1423 Stanley Avenue, a unit which is identical to five of the seven properties[4] at issue herein, sold at auction for $575,000.  Annexed hereto as Exhibit C is a copy of the referee's deed from Helene Blank, Esq., evidencing the foreclosure sale.  With the addition of transfer taxes and other fees, the total cost to the purchaser was approximately $600,000.  The recent free market sale of 438 Amber Street, another identical property, for $750,000 is indicative of the true fair market value of the units at issue herein.  Annexed hereto as Exhibit D is a copy of the deed and recording documents evidencing the sale of 438 Amber Street for $750,000.

6.    Contrary to the Trustee's unsupported assertions, the Properties would produce gross proceeds between $4,200,000 and $5,200,000.  As Loring's single largest secured creditor holding the $5,000,000 Judgment, Amethyst will carve out a fee of up to $200,000 for a competitive sale of the Properties.  Stout would surely carve out at least $70,000 from the proceeds, if not more, in order to maximize the sales proceeds.  It should be noted that in the foreclosure action entitled <u>Stout v. Halifax Group LLC, et al.</u>, State of New York, Kings County, Index No. 25128-2011 ("Foreclosure Action"), Stout's purported secured claim was curtailed in State court to less than $3,600,800. However, based on the Appellate Division decisions discussed below, and the application of the Rooker-Feldman doctrine, Stout will be unable to recover any amount for its fraudulently obtained mortgages.  Moreover, Stout has no unsecured claim against the Loring bankrupt estate.  Annexed hereto as Exhibit E is a copy of the Referee's Report rendered prior to the Appellate Division decisions described in further detail below.

---

[4] Five of the disputed properties sit on parcels that are twenty feet wide.  The other two properties sit on thirty-foot wide parcels, making them considerably more valuable.

7.      The Trustee has also demonstrated bias against Tarter Krinsky's client, Griffon Loring LLC ("Griffon") by the kid-glove treatment afforded to its obvious overreaching. The Trustee first learned of Griffon's attempts to collect rents at the Loring properties via a letter to the court dated September 19, 2017 (Doc. No. 138), from a tenant, Samuel Floed, who resides at 438 Sapphire Street ("Floed Letter"). However, the Trustee took no action.[5]

8.      Shah, on behalf of Griffon, filed an action to quiet title against the Properties in January 2018. Again, the Trustee took no action. The Trustee continued to take no action to hold Griffon in contempt, even when Griffon refused to halt its stay violations, until May 2018 when it finally wrote a letter to the State Court.

9.      On May 10, 2017, the Trustee's counsel, Robert Wolf, Esq. ("Wolf"), acknowledged a conflict of interest with respect to Griffon, as an entity affiliated with Delshah Capital LLC ("Delshah Capital"). (Doc. No. 124, p. 24). Wolf stated, "My firm, Tarter Krinsky, has done work and still does work for Delshah. When I found out I obtained written conflict waivers from both the Trustee and from Delshah. I'm certain I filed a supplemental disclosure in this case." (Id.).

10.     Despite that professed certainty, Wolf did not file a supplemental disclosure until June 7, 2018 (Doc. No. 148). The Supplemental Disclosure contains no written conflict waivers, but professes, instead, to keep an ethical wall between Delshah-related activities and this matter. This admitted conflict of interest should be considered in connection with the Trustee's apparent preference for a $70,000 insider deal with Stout, purportedly to resolve a stay violation, instead of pursuing the stay violation directly and recovering damages. The stay violations could result in an

---

[5] Stout also took no action, and seemingly preferred to besmirch my name with Shah's misconduct.

equal or greater recovery from Griffon for its misconduct, as well as for its open and notorious violations of the automatic stay.    Although Stout has carefully documented Griffon's transgressions with respect to the Properties, Stout's documentation began only after Griffon successfully collected rents, unopposed by the Trustee, at the Loring-owned property at 1432 Loring Avenue ("1432 Loring").  Not only is Griffon improperly collecting rents at 1432 Loring, but Shah also operates his medical office rent-free from that location.  Annexed hereto as Exhibit F is a Yellow Pages listing for Shah's cardiology practice at 1432 Loring Avenue, Brooklyn, New York.

11.    1432 Loring was included in the original mistaken deed to Griffon that was subsequently corrected by the Sheriff's Correction Deed.  I previously detailed the litigation and title issues affecting 1432 Loring in September 2016. (ECF Doc. No. 90-1).  Shah has apparently taken possession of that property and, for the last two years, has been collecting rents and using the first floor and basement space as his medical office.

12.    As I stated in my letter to Wolf, a copy of which is annexed hereto as Exhibit G, Griffon's actions with respect to the Properties have deprived the creditors and the estate of nearly $150,000.  Furthermore, at the time of Wolf's admission of his conflict of interest on May 10, 2017, he believed that he had already filed supplemental disclosures when in fact he did not file them until June 7, 2018.  These supplemental disclosures did not include any type of written conflict waiver, but rather propounds an "ethical wall" between this matter and Delshah-related activities.

13.    This "ethical wall" may reflect a sincere effort to remain objective, as the court stated in In re Philadelphia Athletic Club, Inc., 20 B.R. 328, 334 (E.D. Penn. 1982), "[e]ven the

'most rigorous self-discipline' will not prevent [counsel]'s judgment from being influenced by his experience as an advocate for a competing interest."  Wolf's conflict of interest with respect to Griffon in this matter is certainly a competing interest to those of the estate and the creditors and as such, he cannot be regarded as disinterested.  The <u>Philadelphia Athletic Club</u> court further stated that "a court may disqualify an attorney for not only acting improperly, but also failing to avoid the appearance of impropriety."  <u>Id.</u> at 336.  Thus, without any conflict waivers, Wolf should be replaced as counsel for the Trustee in this matter.

14.    The total equivalent rental value of 1432 Loring for the last two years is more than $150,000.  These funds are property of Loring, taken by Griffon and Shah in direct violation of the automatic stay.  Clearly, the Trustee should recover those funds if its "ethical wall" would permit.

15.    Furthermore, and equally important. Welton is not a good-faith purchaser of the Properties; the Trustee concedes that Welton is "a party friendly to Stout Street Fund I, L.P." (Trustee's Motion ¶ 3).  The Second Department has finally adjudicated that Stout's interests are effectively extinguished, pursuant to the Judgment, returning the property to Loring as DLJ's Notice of Pendency was recorded prior to Stout's later-filed mortgage,[6] and the DLJ Notice of Pendency gave notice to Stout of DLJ's claim. Further, the Second Department noted that Stout's own underwriting file contained "numerous indicia of fraud surrounding the Loring/Stout Properties." <u>Stout St. Fund I, L.P. v. Halifax Group, LLC</u>, 148 A.D.3d 744, 746 (2d Dept. 2017), a copy of which is annexed hereto as Exhibit H.  A copy of the companion decision, <u>Stout St. Fund I, L.P. v. Halifax Group, LLC</u>, 148 A.D.3d 749 (2d Dept. 2017) is annexed hereto as Exhibit I.

---

[6] DLJ and now Amethyst by the assignment, is entitled to priority as its Notice of Pendency was recorded first.  Under New York's race-notice Recording Act (RPL 291) the first to record is entitled to priority unless the first to record is not a good faith purchaser.  Thus, Stout's frivolous claim of good faith purchaser status became irrelevant once the Appellate Division confirmed that it was not the first to record.  Since leave to appeal to the Court of Appeals was denied, any attempt to overturn the State court result is prohibited under the Rooker-Feldman doctrine.

16.     The Second Department reinstated DLJ's fraudulent conveyance cause of action against Stout and held that "DLJ sufficiently alleged 'badges of fraud,' including the inadequacy of consideration received by Halifax," and that DLJ sufficiently alleged that "Halifax, the mortgagor in the transaction, was a participant in the mortgage fraud scheme involving the same properties,of which DLJ was a victim."   148 A.D.3d at 748.   Thus, not only have Stout's Mortgages been extinguished, Stout is liable for damages for its participation in the fraudulent conveyance.

17.     The Trustee's own Motion annexed a copy of Justice Ramos' Judgment voiding the transfer of the Properties from Loring to Halifax as its Exhibit B.

18.     Although the Trustee is ostensibly a "neutral party" whose duty is to act in the best interests of the Estates, the Trustee's Motion effectively advances the interests of Stout in the pending Foreclosure Action, the losing party in the attached Second Department decisions.   At the same time, the Trustee ignores the restored cause of action for damages against Stout for facilitating the fraudulent transaction by ignoring the badges of fraud.   Ostensibly, the reason for the Trustee's sale to Stout's "friend" is to assist Stout in meeting the alleged "false claims" and litigation by Griffon, and that "Purchaser has informed the Trustee that it desires to acquire the Estate's Realty Interests to avoid further unauthorized and specious filings in the name of the Debtor and otherwise."  (Trustee's Motion ¶ 3).

19.     The Federal Bankruptcy Code promulgates a two-pronged test for professionals, including attorneys, retained by the trustee to represent or assist him in carrying out his duties under 11 U.S.C. § 704.   First, the trustee is authorized by 11 U.S.C. § 327(a) of the Bankruptcy Code to employ attorneys that do not hold or represent an interest adverse to the estate.   Second, these attorneys must be disinterested persons.   Although the phrase "adverse interest" is not

defined in the Bankruptcy Code, some courts have interpreted it to mean: the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant. In re Vebeliunas, 231 B.R. 181, 188 (S.D.N.Y. 1999). The disinterestedness requirement is enunciated in the Bankruptcy Code in 11 U.S.C. § 101(14), which defines a "disinterested person" as a person who is not: (a) a creditor, equity security holder, or an insider; (b) is not and was not, within 2 years before the date of filing of the petition, a director, officer, or employee of the debtor; and (c) **does not have an interest materially adverse to the interest of the estate or any class of creditors due to any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.**

20.      The disinterestedness of Trustee's counsel, Wolf, is furthermore doubtful when considering the fact that the Trustee is attempting to sell the Properties for prices that are significantly lower than what could be obtained in an auction. As stated in Spielfogel, a bankruptcy trustee is bound by a duty of loyalty which requires the trustee to refrain from self-dealing, avoid conflicts of interest and the appearance of impropriety, treat all parties to the case fairly, and maximize the value of the estate. 211 B.R. 133, 144 (E.D.N.Y. 1997). In Spielfogel, a Chapter 11 trustee approved a settlement agreement which the court subsequently rejected because it did not meet the standard of being fair, equitable, and in the best interests of the estate. The Spielfogel court emphasized that a "court must make an independent determination and cannot simply accept the trustee's word that [a] settlement is reasonable or rubber stamp the Trustee's proposal." Id. at 143. Similarly, in the instant action, the Trustee's proposed sale, in which the seven Properties would be sold for a much lesser amount than could be obtained at auction, is not one which is fair,

equitable, and in the best interest of the estate. See also, In re Metro. Elec. Mfg. Co., 295 B.R. 7 (E.D.N.Y. 2003) (stating "the trustee must answer to the Bankruptcy Court in the event the trustee fails to act in an objectively reasonable manner in carrying out his or her duties.").  In this matter, the Trustee's proposed sale cannot be viewed objectively as being fair, since the value of the estate will not be maximized and the sale does not treat all parties fairly, as creditors and the estate will be unable to receive the maximum value for the Properties at issue.  Although Wolf's conflict of interest is supposedly being contained by an "ethical wall," the Trustee's refusal to conduct an auction of the Properties adds an extra appearance of impropriety to the entire matter and therefore, the court must determine whether the Trustee's proposed sale is fair, equitable, and in the best interest of the estate.

21.    Furthermore, the Trustee falsely accuses me of being "associated" with Griffon. (Trustee's Motion ¶ 15).   However, I have never had any direct or indirect interest in Griffon. Moreover, I have never had anything to do the "false claims" of Griffon and I join Stout in decrying the actions of Griffon.

22.    The Trustee cites to my email dated December 19, 2012 (Trustee's Exhibit H), contending that I advised Stout's attorney that Griffin had acquired twelve units at a "spirited sheriff's sale" where "our winning bid" was successful.  Although this exhibit is my email, it was sent **on behalf of my former client, Delshah Capital**.  My client was the interested party, not me individually.

23.    Likewise, the Trustee cites to my Affidavit in the Foreclosure Action, sworn to on November 22, 2016, in which I stated, "In December 2102, an entity with which I was affiliated,

Griffon Loring LLC, purchased 12 of the Loring properties at a sheriff's sale for $3,300,000." My "affiliation" was, however, only with my client Delshah Capital, **not with Griffon**.

24.     The Trustee also cites to a letter dated April 15, 2015 (Trustee's Exhibit K), in which I signed "as authorized signatory" on behalf of Griffon making an offer to the Trustee. That temporary affiliation as limited agent no longer exists. **The letterhead on that letter belongs to Delshah Capital**—by whom I was employed at the time. However, I was never a principal of Griffon.[7]

25.     I terminated my employment with all of the Delshah Capital entities, in or around January 2016, after I reached the Social Security retirement age of 66. I continued to close out some legacy matters for several months thereafter.

26.     The Trustee also asserts that the offer made by Concord Loring in May 2017 to purchase the Trustee's right, title, and interest in several properties, including the Properties subject to the Stout Foreclosure Action (Trustee's Motion ¶ 24), was somehow inconsistent if Griffon held title to the twelve parcels as asserted in the prior correspondence. But I had (and continue to have) no interest in <u>Griffon</u>. I did (and still do) have a personal interest in <u>Concord</u> Loring LLC.

27.     In fact, the Trustee's bias is evident because he appears to want to limit his sale to anyone but me. The Motion states, "The Trustee's current proposed Purchaser, Welton R.E. Corp., is unrelated to Mr. DeLuca and also unrelated to the other known principal of Griffon, one Darshan Shah." (Trustee's Motion ¶ 14).

28.     The Trustee's motion also seeks extraordinary relief. Although the Motion purports to sell the Trustee's right, title, and interest to the Properties in the Foreclosure Action subject to all

---

[7] During my employment at Delshah Capital, I did not pursue any of the claims now advanced by the principals of Griffon, as I understood the original Sheriff's deed to be a unilateral mistake. Indeed, I immediately advised Stout's counsel of the mistaken deed in early 2013, and the correction deed was filed as a direct result.

liens and encumbrances, the Trustee's sale also would be "free and clear of any claim or interest respecting the Estate's Realty Interests asserted by Griffon Loring, LLC and anyone claiming by or through Griffon Loring LLC (the "Griffon Loring Claim")". (Trustee's Motion ¶ 4). (*See also*, Section 13.2 of the Trustee's Purchase and Sale Agreement.) The Trustee's request for this extraordinary relief confirms that its Motion amounts to an accommodation to Stout and that the Trustee is biased in favor of Stout in the pending contested Foreclosure Action (in which the Second Department reversed rulings that were in favor of Stout).

29.    The docket in Griffon Loring LLC v. Loring Estates, LLC, Kings County, Index No. 501948/2018, (the "Griffon-Loring Action") shows that the state court judge denied the Petition on May 29, 2018, "in light of the fact that the Petition was filed after the Bankruptcy filing of Respondent Loring Estates, LLC."  The Trustee has remedies and sanctions available to him against entities[8] such as Griffon, who has violated the automatic stay, short of the extraordinary relief the Trustee now seeks − to sell his interests only to a "friend" of Stout, free and clear of claims of Griffon, and no one else.

30.    Additionally, Loring is not a named defendant in the Stout Foreclosure Action. However, in another maneuver to change the outcome of the Second Department decisions, Stout recently sought to enter a "default judgment" against Loring in the Foreclosure Action and served the Trustee with motion papers — to which the Trustee did not respond.  The "default judgment" motion which was opposed by Amethyst is currently pending before the state court.  The Trustee declined to oppose Stout's motion to enter judgment against Loring — even though Loring was

---

[8] Wolf has acknowledged the Trustee's conflict of interest regarding Delshah-related entities such as Griffon.

never a named defendant, yet the Trustee is eager to sell (for just $70,000.00) his right, title, and interest, to a "friend" of Stout. This further confirms the Trustee's bias in favor of Stout.

31.     Amethyst also objects to the waiver of the 14-day stay under Bankruptcy Rule 6004(h). This waiver, for no good reason, would impair any party in interest (including Amethyst) from taking an appeal or requesting a stay pending appeal and is further evidence of the Trustee's bias in favor of Stout.

32.     The Second Department's decisions in the Foreclosure Action disrupted what Stout perceived as a quick foreclosure of its mortgage granted by Halifax. The unenforceability of the Stout Mortgages was recognized on appeal. The parcels which Stout allegedly encumbered with its mortgages given by Halifax were never properly conveyed by Loring to Halifax; therefore, any mortgage claim of Stout is void and any other claim is subject to the Judgment owned by Amethyst. Further, the evidence of Stout's active participation in the fraudulent sale of the Loring Properties to Halifax leaves open the question of its liability to Loring and its creditors under the Debtor-Creditor Law. The Trustee's sale is nothing less than an attempt by Stout to bypass any state court trial on the merits, challenging its active role in the fraud perpetrated by Kontogiannis in the sham sale of Loring's real property to Halifax and voidable mortgaging of the underlying property to Stout.

33.     I respectfully request that this Court replicate what it did in the related <u>Axxion</u> liquidation: to conduct a public bankruptcy sale of the parcels that are subject to the Stout Foreclosure Action, with liens to attach to the proceeds of the sale. That would both assure a measure of good title to the purchasers at the bankruptcy sale and resolve the decade-old dispute as to title, rents, occupancy, and additional issues that have plagued these parcels.

34.     Through court-appointed receivers, Stout has been in control of the Properties for the last seven years.  Stout has allowed the Properties to deteriorate physically and become filled with drug dealers and similarly deleterious individuals.  The Floed Letter is instructive.  Prompted by David Pellegrino, Esq., Stout's counsel, ("Pellegrino"), the Floed Letter, without any evidence of my involvement, needlessly includes my name.  The Floed Letter is, in fact, an indictment of Stout's (and Pellegrino's) control over the Properties for the last seven years.  Floed states, "I put [sic] myself and my family's life in [a] danger[ous] position, because not only my building, but all 7 buildings in this case, became target[s] of homeless people[,] many of them danger[ous] criminals, drug suppliers, prostitutes and [other criminal activity]."  (Doc. No. 138.)

35.     Floed continued, "During this time, I start[ed] paying my rent to the [App]ointed Receiver through NYC Management…  Even [though] I paid the rent the attention of Management was zero. 53 reports to 311 and 911 and didn't change nothing…..  All this time I used to communicate with Mr. Pellegrino. … which helped and supported me morally."  (Id.).  However, Pellegrino's "moral support" did nothing to improve the situation living conditions.  Instead, Pellegrino used his connection to Floed to concoct a false narrative to attack me.  Floed's use of my name in his letter must have been planted by Pellegrino, as I have never had any communication of any kind with Sam Floed or any other tenant of the seven Properties.

36.     My philosophy for distressed property investing requires that I try to maximize the overall recovery to facilitate settlement of disputes between secured creditors.  For my efforts, I have been roundly and unjustifiably vilified.  In the Cross-Island Plaza case, there was absolutely no advantage to holding a $300,000 mortgage on the Parking Lots owned by a non-debtor worth $5,400,000.  Rather than trying to exclude anyone from the bidding, I advocated that the Parking

Lots be included in the Cross-Island Estate and sold simultaneously to the highest bidder, thereby eliminating the risk that the office building would be deprived of the necessary parking.

37.    Similarly here, I have been vilified for believing that obtaining Certificates of Occupancy for the Properties would benefit all the Estates Homeowners and creditors alike.  Since 2013, I have spent many hours meeting with engineers, local public officials, and representatives of the Department of Buildings and Department of Environmental Protection ("DEP") to resolve Loring's Certificate of Occupancy issues. In early-2016, I achieved a breakthrough with DEP by getting the Estates' Sewer system approved.  The logic of my prior offer was to put me into a position where I could complete my efforts in obtaining the Certificates of Occupancy.  However, there are other competent people of good will who could potentially complete the paperwork.  It is more important that the Properties be put into the hands of motivated individual owners rather than absentee investors.

38.    The Trustee's motion to sell his right, title, and interest to the seven Properties should be denied, or at best, it should be conditioned on a public auction of that interest to allow competitive bidding. The proposed purchaser, Welton, is not a good faith purchaser, and its management has substantially deteriorated the Properties; it is admittedly not entitled to any insulation through Bankruptcy Code Section 363(m) and should not, for $70,000, be allowed to benefit from a "sweetheart" contract and order arbitrary conveyance of title free and clear of one specific claim but subject to all others.

I declare that the foregoing statements are true under penalty of perjury.

   _/s/ Lorenzo Deluca_
   LORENZO DELUCA

Dated: July 12,  2018